```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
TYRIN TORRES and
DAQUAN BRADLEY,

                    Plaintiffs,              16 CV 6719 (BMC)

        -against-

THE CITY OF NEW YORK,                        AMENDED COMPLAINT
JOHN SIOKAS, CHRISTOPHER WARD,
EUGENE JONNY, and JOHN DOE,

                    Defendants.
----------------------------------X
```

Plaintiffs Tyrin Torres and Daquan Bradley, by their attorneys Lumer & Neville, as and for their Complaint, hereby allege as follows, upon information and belief:

## PARTIES, VENUE and JURISDICTION

1.  At all times hereinafter mentioned, plaintiffs Torres and Bradley were adult male residents of Kings County, within the State of New York.

2.  At all relevant times hereinafter mentioned, defendant City of New York ("New York City") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the New York City Police Department ("NYPD"), and their employees.

3.  At all relevant times hereinafter mentioned, defendant John Siokas (Tax No. 942554), was employed by the City of New York as a member of the NYPD. Siokas is sued in his individual capacity.

4.   At all relevant times hereinafter mentioned, defendant Christopher Ward (Shield No. 6633), was employed by the City of New York as a member of the NYPD. Ward is sued in his individual capacity.

5.   At all relevant times hereinafter mentioned, defendant Eugene Jonny (Shield No. 2802), was employed by the City of New York as a member of the NYPD. Jonny is sued in his individual capacity.

6.   At all relevant times hereinafter mentioned, defendant John Doe was employed by the City of New York as a member of the NYPD. The exact identity of John Doe is not presently known to the plaintiffs. Doe is sued herein in his individual capacity.

7.   This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343, as well as 42 U.S.C. § 1983.

8.   Venue is properly laid, pursuant to 28 U.S.C. Section 1391, et seq., in the Eastern District of New York, where the plaintiff and defendant City of New York reside, and where the majority of the actions complained of herein occurred.

**RELEVANT FACTS**

9.   On March 11, 2015, at or between approximately 8:30 and 9:00 pm, plaintiffs were lawfully present in a vehicle in the vicinity of Mermaid Avenue and West 16 Street in Brooklyn, New York, when they were stopped and seized by members of the NYPD.

10.   These officers included Siokas, Ward, and Jonny, and possibly John

Doe.

11. The plaintiffs were not engaged in any criminal conduct, nor was they engaged in any conduct that could reasonably be viewed as criminal or that would otherwise reasonably permit the defendants to stop plaintiffs for any reason.

12. The plaintiffs were pulled from the vehicle and promptly arrested.

13. The plaintiffs had not been, and were not engaged then, in any criminal conduct, or any activity that the defendants could reasonably have believed was criminal.

14. The defendants lacked reasonable suspicion to stop and question the plaintiffs.

15. Despite the absence of sufficient legal cause, defendants stopped and seized plaintiffs, and then placed them under arrest.

16. While they were in defendants' custody, one of the defendants stated to plaintiffs that he had personally observed them assault and rob someone.

17. This statement was entirely false as neither of the plaintiffs had engaged in such conduct, or any conduct that could reasonably be mistaken for such criminal activities, and thus the defendant could only be understood to be lying.

18. A show-up identification procedure was also conducted at or near the scene of the arrest in which the plaintiffs, and one other person, were displayed to a man named Wilfredo Vasquez, who was the victim of the assault and robbery.

19. Vasquez did not identify either of the plaintiffs as one of the men who had attacked or robbed him, although he did positively identify a third person whom

defendants had also seized and stated that a fourth person had fled the scene.

20. Notwithstanding the negative identification of either plaintiff by Vasquez, and absence of probable cause to arrest them, the defendants transported the plaintiffs to a local area NYPD service area where their arrests were processed.

21. While the plaintiffs were imprisoned by the defendants, Siokas completed arrest paperwork in which he falsely stated that Vasquez had identified the plaintiffs as individuals who had robbed and assaulted him.

22. Siokas and the other defendants knew, at the time that he was drafting the arrest paperwork, that Vasquez had not identified the plaintiffs, and any suggestion by Siokas that such an identification had occurred was materially and knowingly false.

23. Siokas and the other defendants knew that these allegations were being drafted, and that they would be forwarded to the Kings County District Attorney's office ("KCDA") in order to persuade the KCDA to initiate criminal charges against the plaintiffs.

24. Siokas and the other defendants knew that the plaintiffs had been arrested without probable cause. The defendants also knew that Siokas, the arresting officer, would be creating arrest paperwork that would contain lies, material omissions, and other fabrications designed to falsely create the impression that probable cause existed for plaintiffs' arrest.

25. The defendants knew and understood that the KCDA, in evaluating whether to commence a criminal prosecution against the plaintiffs, would rely on the truthfulness of their factual claims and statements, and would proceed on as assumption that

all of these factual statements and claims were truthful in all material respects, and that no material or exculpatory information had been withheld.

26. Siokas, having forwarded the arrests paperwork to the KCDA, was then interviewed by the KCDA.

27. This interview was a routine step in the KCDA's determination as to whether or not to commence the criminal prosecution of either plaintiff, and if so, the charges to be filed.

28. During this interview, Siokas told the KCDA, in relevant part, that he personally witnessed the plaintiffs "kicking and punching [Vasquez] about the face."

29. Siokas further told the KCDA that Vasquez told him that the plaintiffs had assaulted and robbed him. Accordingly, when he saw the plaintiffs some time thereafter, he seized and arrested them.

30. As a direct result of these false allegations by the defendants, the plaintiffs were criminally charged by the KCDA under docket 2015KN014749 with multiple counts of robbery, assault, and other related charges.

31. Plaintiffs remained in custody through their arraignment on these charges.

32. At no time prior to plaintiff's arraignment did any of the individual defendants make any effort to correct, modify, or supplement the information provided to the KCDA, and thereby failed to intervene in the imprisonment of the plaintiffs and the initiation of criminal process against them.

33. The KCDA did not present this case to the grand jury.

34. During the course of the plaintiffs' prosecution, Torres provided proof to the KCDA in the form of video evidence that he was elsewhere during the alleged crime.

35. During the course of the plaintiffs' prosecution, John Siokas reversed course, and told the KCDA that he had not actually seen the plaintiffs engage in this crime.

36. Vasquez continued to deny throughout the course of plaintiffs' criminal prosecution that either plaintiff was one of the perpetrators.

37. On May 22 and September 25, 2015, the KCDA moved to dismiss all charges against plaintiffs Torres and Bradley, respectively, and both plaintiffs' prosecutions were terminated in plaintiffs' favor.

38. The arrest and imprisonment of plaintiffs was objectively unreasonable.

39. At no time did any of the defendants take any steps to intervene in, prevent, or otherwise limit the above mentioned misconduct.

40. That at all times relevant herein, the defendants were on duty and acting within the scope of their employment, and their acts were done in furtherance of the City of New York's interests and without legal justification or excuse.

## FIRST CAUSE OF ACTION

### (§1983 Claims Against the Individual Defendants)

41. Plaintiffs repeat the preceding allegations as though stated fully herein.

42. The individual defendants willfully and intentionally seized, searched,

detained, and arrested plaintiffs without probable cause, and without a reasonable basis to believe such cause existed.

43. The individual defendants deliberately forwarded fabricated evidence to justify and cover up the false arrest of the plaintiffs, and forwarded said fabrications to the KCDA, resulting in the initiation and continuing of plaintiffs' criminal prosecution and the deprivation of plaintiffs' liberty

44. To the extent that any one of the individual defendants did not personally engage in the arrest of plaintiff without probable cause, or the fabrication of evidence concerning plaintiff's arrest, or the punching, kneeing, striking, or other uses of force against plaintiff, or any of the other unconstitutional conduct alleged herein, he or she witnessed this conduct as it occurred, was aware that it was occurring or would occur, had an ample opportunity to intervene to prevent it from occurring or continuing to occur, and failed to do so.

45. By so doing, the individual defendants subjected the plaintiffs to (i) false arrest and imprisonment, (ii) the deprivation of his right to a fair trial through the use of fabricated evidence, and (iii) malicious prosecution, and thereby violated and aided and abetted in the violation of plaintiffs' rights under the Fourth, Sixth and Fourteenth Amendments of the United States Constitution.

46. By reason thereof, the individual defendants have violated 42 U.S.C. §1983 and caused plaintiffs to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of their constitutional rights.

## SECOND CAUSE OF ACTION

### (*Monell* Claim Against the Municipal Defendant)

47. Plaintiffs repeat the preceding allegations as though stated fully herein.

48. The individual defendants' false arrest and assault of plaintiffs, as well as their fabrication of evidence against plaintiffs to justify their unconstitutional conduct, and their failure to intervene or otherwise act to prevent or mitigate the harms being inflicted by their fellow defendants, were carried out in accordance with an existing plan or policy created or otherwise condoned by the municipal defendant designed to increase the number of arrests made without regard to probable cause.

49. The purpose of this policy or plan was to generate large numbers of arrests to help the NYPD create a false impression of positive activity by their officers.

50. In addition, members of the NYPD are evaluated, at least in part, on the basis of their "activity" which is measured by the number of arrests made, search warrants secured, and other, similar criteria. Thus, members of the NYPD routinely make arrests and engage in other police activity without sufficient legal cause in order to raise their levels of "activity" and improve the perception of their job performance.

51. The NYPD tracks the number of arrests made by each officer but, evaluating its officers, does not take into account the outcome of these arrests, even though this information is available to the NYPD. As a result, officers are well aware that (a) they are being evaluated based on, in large part, the number of arrests made, and (b) their supervisors do not care whether these arrests lead to actual criminal prosecutions, much less convictions.

52. More precisely, under this policy or plan, officers are encouraged or pressured to make as many arrests as possible, which has caused and will continue to cause, its officers, including the individual defendants and their colleagues, to make arrests regardless of whether there was any factual basis for the charges. The officer(s) would then fabricate claims of having seen the person(s) being arrested in possession of weapons or illegal narcotics or otherwise engaged in criminal activity.

53. The purpose of this policy or plan was to generate large numbers of arrests within the individual commands therein, in order to create a false or misleading impression of positive activity by their officers and satisfying internal quotas.

54. In addition, members of the NYPD are evaluated, at least in part, on the basis of their "activity" which is measured by the number of arrests made, summonses issued, and other, similar criteria. Members of the NYPD routinely make arrests and engage in other police activity without sufficient legal cause in order to raise their levels of "activity" and improve the perception of their job performance.

55. Upon information, this policy was in existence as of March 2015, as codified in an October 17, 2011, Police Officer Performance Objectives Operation Order in which NYPD Commissioner Kelly directed all commands that, "Department managers can and must set performance goals" relating to the "issuance of summons, the stopping and questioning of suspicious individuals, and the arrests of criminals."

56. Upon information and belief, that same Operation Order stated, "uniformed members. . . .Who do not demonstrate activities . . . or who fail to engage m

proactive activities . . . will be evaluated accordingly and their assignments re-assessed."

57. In the case of *Floyd v City of New York*, 813 F. Supp. 2d 417, 448 (S.D.N.Y.) on reconsideration, 813 F. Supp. 2d 457 (S.D.N.Y. 2011), United States District Judge Shira A. Scheindlin denied the City of New York's motion for summary judgment, in part, based on evidence that the NYPD had a widespread practice of imposing illegal stop and frisk, summons, and arrest quotas on officers. The evidence cited in *Floyd*, included testimony from various officers, audio recordings of roll call meetings in which precinct commanders issued orders to produce certain numbers of arrests, stops and frisks, and summonses, and a labor grievance on behalf of six officers and one sergeant who were transferred out of the same 75 precinct where plaintiff was arrested for allegedly failing to meet a ten summons-per-month quota. In January 2006, a labor arbitrator found that this same 75 precinct had imposed summons quotas on its officers in violation of New York State labor laws.

58. In another Southern District of New York case, *Schoolcraft v. City of New York*, 10 CV 6005 (RWS), the plaintiff, a police officer assigned to Brooklyn's 81 precinct alleged that precinct commanders and supervisory personnel expressly imposed arrest and summons quotas, and explicitly directed officers to "arrest and summons fully innocent people" and then come up with a justification later.

59. In 2012, Police Officer Craig Matthews commenced *Matthews v. City of New York*, 12 CV 1354 (BSJ) in the Southern District of New York, alleging that his complaints that the existing quota system was leading to unjustified stops and arrests, and

thereby causing damage to the department's relationship with the local community led to his termination. There was little dispute that he made these complaints or that they were well founded. *See Matthews v. City of New York*, 779 F.3d 167, 169 (2d Cir. 2015).

60. That this plan is still in effect is reflected in a class action suit apparently filed in August 2015 by various police officers alleging that the NYPD still requires officers to meet fixed numerical goals for arrests and court summonses each month, according to a New York Times article published February 18, 2016, which can be found online at http://nyti.ms/1R9FCGu.

61. The policy or plan was kept in effect through the date of plaintiff's arrest, despite the municipal defendant's knowledge that county prosecutors were often not charging the individuals arrested, or otherwise not actively pursuing their prosecutions, or that there was insufficient evidence to justify the arrests and illegal searches, or that the arresting officers were seeking to bolster the arrests with false allegations, and that the prosecutors often had found insufficient cause to justify the imposition of charges or continued prosecution if charges were filed.

62. The City has been put on notice of such misconduct through the filing of thousands of lawsuits against members of the NYPD over the past several years. For instance, according to an article in New York Magazine, dated October 10, 2014, the City of New York issued a report reflecting that it paid an average of $33,875 per case to resolve well over 10,000 cases between 2009 and 2014, and that figure did not take into account filed cases that were still pending when the report was compiled. Similarly, the City Comptroller

has reported that the City of New York's payments to resolve allegations of misconduct by members of the NYPD had risen from $99 million to $217 million in between 2005 and 2014, as stated on Page 2 in the Comptroller's August 2015 report at http://nylawyer.nylj.com/adgifs/decisions15/083115claims.pdf. While such numbers relate to the NYPD as a whole, they reflect that the City had actual knowledge that its police department was routinely engaging in unconstitutional and unlawful conduct, at least some of which can be attributed to a quota policy that stressed the need for a specific quantity of arrests, without regard for quality, meaning evidence supporting probable cause for the arrests..

63.  In October 2011, following a bench trial in New York State Supreme Court, Kings County, under indictment number 06314-2008, former NYPD narcotics officer Jason Arbeeny was convicted of planting drugs on two individuals and falsifying arrest reports. Before issuing a verdict of guilty, the trial judge scolded the NYPD for what he described as a "widespread culture of corruption endemic in its drug units." The judge further stated that the testimony demonstrated that the NYPD narcotics divisions maintain a "cowboy culture" and that he was "shocked, not only by the seeming pervasive scope of misconduct but even more distressingly by the seeming casualness by which such conduct is employed."

64.  In an Order dated November 25, 2009, in *Colon v. City of New York,* 09-CV-0008 (E.D.N.Y.), the Hon. Jack B. Weinstein stated:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has

revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration -- through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department -- there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

65. It is thus manifestly clear through the litigation brought in the Eastern and Southern Districts of New York, as well as the many cases filed in New York's State courts, that thousands of civilians have alleged that members of the NYPD generally, and the NBBD in particular, have deliberately arrested them without probable cause. Thus, even if the municipal defendant was not the architect of the policies and routinized conduct causing these unlawful arrests, they were certainly on notice of the practice, and by failing to take any meaningful corrective steps, have ratified, endorsed, or otherwise communicated its acceptance of this policy to the officers it employs.

66. Rather than take meaningful steps to reduce and eliminate such misconduct by its officers, the City of New York and the NYPD have instead affirmatively announced a renewed commitment to defending such misconduct. In an article in the New York Times on February 4, 2016, the link to which is http://nyti.ms/1nPv0mO, the City proudly announced that the NYPD had "created a new 40-member legal unit that develops evidence that the Law Department can use to defendant lawsuits against the police, and the [Law Department] hired about 30 lawyers to bolster its litigation teams and to try more cases in court." According to this article, these steps were warmly received by police union

leaders.

67. The City's stated response to the wave of litigation caused by misconduct on the part of the NYPD is thus directed not at the deliberate and frequent constitutional violations underlying the consequential litigation, but rather at defending such misconduct so that officers can continue to engage in unconstitutional conduct without fear of being sued or held accountable. In so doing, the City has dispensed altogether with any pretense that such misconduct is not sanctioned, ratified, or otherwise endorsed by the City of New York and the NYPD's executive leaders and supervisory personnel.

68. It is therefore clear that the municipal defendant has not only tolerated, but actively fostered a lawless atmosphere within the NYPD and that the City of New York, at the bare minimum, has been on notice was deliberately indifferent to the risk that the undue emphasis on arrest quotas, or minimum activity levels, particularly when coupled with a deliberately indifferent level of supervision, would lead to the violation of individuals' constitutional rights in general, and caused the violation of plaintiff's rights in particular.

69. By reason thereof, the municipal defendant has violated 42 U.S.C. §1983 and caused plaintiff to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of his constitutional rights.

## DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, plaintiffs hereby demand a jury trial of all issues capable of being determined by a jury.

WHEREFORE, the plaintiffs demand judgment against defendants jointly and severally as follows:

    i.    on the first cause of action, actual and punitive damages against the individual defendants in amounts to be determined at trial;

    ii.    on the second causes of action, actual damages against the municipal defendant in an amount to be determined at trial;

    iii.    statutory attorney's fees pursuant to, *inter alia*, 42 U.S.C. §1988 and New York common law, disbursements, and costs of the action; and

    iv.    such other relief as the Court deems just and proper.

Dated: New York, New York
April 11, 2017

        LUMER & NEVILLE
        Attorneys for Plaintiffs

By: _____
Michael Lumer, Esq.
225 Broadway, Suite 2700
New York, New York 10007
(212) 566-5060